Owen Yeates (pro hac vice to be filed)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW
Ste. 801
Washington, DC 20036
202-985-1644
oyeates@ifs.org

Albert Jones (Bar No. 14144)
VALLEY LAW, PLLC
517 S. 22nd Ave.,
Ste. 5
Bozeman, MT 59718
406-319-3024
albert@valleylawmt.com

*Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**HELENA DIVISION**

| | |
|---|---|
| FRONTIER INSTITUTE, a Montana nonprofit corporation; FRONTIER ACTION FUND, a Montana nonprofit corporation; MONTANA FAMILY INSTITUTE, a Montana nonprofit corporation; MONTANA FAMILY FOUNDATION, a Montana nonprofit corporation; and MONTANA REPUBLICAN STATE CENTRAL COMMITTEE, a Montana political party committee,<br><br>*Plaintiffs*,<br><br>*v.*<br><br>AUSTIN KNUDSEN, in his official capacity as Montana Attorney General; and CHRISTI JACOBSEN, in her official capacity as Montana Secretary of State,<br><br>*Defendants*. | CV-26-73-H-WWM<br><br>**COMPLAINT** |

## INTRODUCTION

The First Amendment protects the right of all Americans to speak about political issues and candidates, and to amplify their voices through association. And to make this expression most effective—through newspapers, labor unions, trade associations, civil rights organizations, and the like—Americans must often organize corporations or other state-sanctioned entities. When they organize such entities to participate in civic life, or to pursue their livelihoods—to run small businesses, to farm, or to manage property—Americans don't thereby lose the First Amendment right to speak about the issues and politicians who impact their communities, their families, and their lives.

That anyone can organize for expressive purposes of course means that unpopular views get amplified as well. But the First Amendment guarantees that lawmakers cannot pick and choose who gets to speak. Nor can lawmakers condition access to any legal benefit on forfeiting the fundamental right of free political speech.

Yet in an effort to silence disliked speakers—something it cannot do—Montana broadly outlawed political speech by so-called "artificial persons." This new categorical speech ban, made into law through Initiative No. 194, is flatly unconstitutional. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342-43 (2010); *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 784 (1978).

I-194 harms everyone. It silences organizations, preventing them from sharing information essential to their purposes. It denies the individuals constituting these groups—especially those not in the majority or not already exercising public instruments of power—the ability to pool their resources, and thus the ability to influence policy. And it harms the public, "restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Citizens United*, 558 U.S. at 339 (quotation marks omitted). It thus diminishes the "right of citizens to inquire, to hear, to speak, and to use information to reach consensus," which "is a precondition to enlightened self-government and a necessary means to protect it." *Id.*

The Court should enjoin this unconstitutional law.

## JURISDICTION

1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983, because it involves a deprivation under color of state law of rights secured by the United States Constitution.

## VENUE

2. Venue lies in this Court under 28 U.S.C. § 1391, as the defendants reside in this judicial district, and all the events and omissions giving rise to the claim occurred in this judicial district. Venue is proper in the Helena division, as Plaintiffs "resided [there] at the commencement of the action," L.R. 3.2(b)(1)(B), but as this is a case involving campaign finance, it "will be randomly assigned to an Article III judge regardless of the division of filing," L.R. 1.2(a).

## PARTIES

3. Frontier Institute is a Montana nonprofit corporation, recognized by the IRS as tax-exempt under 26 U.S.C. § 501(c)(3).

4. Frontier Action Fund is a Montana nonprofit corporation, which will seek recognition by the IRS under 26 U.S.C. § 501(c)(4).

5. Montana Family Institute is a Montana nonprofit corporation, recognized by the IRS as tax-exempt under 26 U.S.C. § 501(c)(3).

6. Montana Family Foundation is a Montana nonprofit corporation, recognized by the IRS as tax-exempt under 26 U.S.C. § 501(c)(4).

7. Montana Republican State Central Committee, also known as the Montana Republican Party, Montana GOP, or MTGOP, is a registered political party committee in Montana.

8. Defendant Christi Jacobsen is sued in her official capacity as the Montana Secretary of State. The Secretary is required to "adopt rules and procedures necessary to implement and enforce" the Act, including the administrative "procedures governing forfeiture, reinstatement, disgorgement, certification of compliance, notice, and the opportunity to be heard." I-194 § 8(1), https://perma.cc/HKR9-97RG.

9. Defendant Austin Knudsen is sued in his official capacity as the Montana Attorney General. "The attorney general has the authority and responsibility to bring actions to enforce" the new law. *Id.* § 8(2).

## Facts

### *Frontier Institute and Frontier Action Fund*

10. Frontier Institute is not owned by any candidate, political party, or political committee. It was founded in 2020 to keep the spirit of the western frontier alive in Montana with sound public policy and educational programs that ensure today's pioneers are free to build, create, and innovate for years to come. It sustains frontier values like individual freedom, self-reliance, relentless optimism, a fierce drive to innovate, radical openness to opportunity, and mutual respect for others, and thus ensure a future where every Montanan has the opportunity to work hard, take risks, and realize their dreams.

11. The Institute furthers this mission by educating leaders and the public about important policy issues and related policy proposals, including issues and proposals related to healthcare, education, forest management, housing, property rights, occupational licensing, courts, and government spending. It creates and publishes original research,

commentary, and policy solutions—including model legislation,[1] research tools,[2] and guides about navigating government systems[3]—about the most pressing issues facing Montana. It holds events and conducts interviews to give citizens and leaders the knowledge and connections they need to make good policy.[4] It periodically provides expert testimony to government officials.[5] It engages in public interest

---

[1] *See, e.g., The Private Property Protection Act Affirms the Fundamental Right to Use Private Property*, Frontier Institute (May 21, 2025), https://perma.cc/PAA3-8CYY; *The Right to Compute Act Affirms Fundamental Rights in the Digital Age*, Frontier Institute (May 12, 2025), https://perma.cc/2TJJ-8N3W.

[2] *See, e.g.*, Mark Egge & Kendall Cotton, *The Montana Zoning Atlas*, Frontier Institute (Mar. 3, 2022), https://perma.cc/UK9W-22GT; Patricia Cummens, *Montana Zoning Atlas: Mapping Drives Bipartisan Housing Reform*, Esri Blog (Jan. 8, 2026), https://perma.cc/KDM3-EDRL.

[3] *See, e.g.*, *Home Education*, Ed Navigate MT, https://perma.cc/A84Q-AHDH (last visited Oct. 21, 2026).

[4] *See, e.g.*, *The Frontier Briefing: Fighting Fraud, Expanding Choice with Commissioner James Brown*, Frontier Institute (July 26, 2026), https://perma.cc/RF2A-T4HT.

[5] *See, e.g.*, *Public Comment to Yellowstone County Commission Regarding Emergency Interim Zoning 9.3.26*, Frontier Institute (Sept. 9, 2026), https://perma.cc/W838-X32J; Tanner Avery, *Frontier Institute*

litigation and has established a litigation project to defend Montanans' rights.[6] And it issues press releases and publishes position statements on its website[7] and through other sources—including social media[8] and newspapers[9]—to communicate the Institute's position on proposed ballot issues and legislation related to key areas of its mission.

---

*Public Comment on Bolstering Data Center Growth*, Frontier Institute (Oct. 28, 2024), https://perma.cc/WE2S-SQLK.

[6] *See, e.g.*, *Frontier Institute Amicus Brief Filed in Felchle v. Montana*, Frontier Institute (Aug. 2, 2024), https://perma.cc/5JUM-9VJL; *Frontier Institute Amicus Brief Filed in Held v. Montana Case*, Frontier Institute (Feb. 20, 2024), https://perma.cc/ZDH8-EZSH; *Big Sky Legal Project*, Frontier Institute, https://perma.cc/7Z7A-VYZT (last visited Oct. 22, 2026).

[7] *See, e.g.*, *Frontier Institute Statement in Support of HB 778*, Frontier Institute (Feb. 27, 2025), https://perma.cc/7R3T-U9U4; *Frontier Institute Statement in Support of SB 101*, Frontier Institute (Jan. 20, 2021), https://perma.cc/8J27-SHR3.

[8] *See, e.g.*, @FrontierMontana, X (Mar. 26, 2026), https://x.com/FrontierMontana/status/2037274597931049430 (supporting BI-11).

[9] *See, e.g.*, Kendall Cotton, *The One-Way Property Tax Ratchet*, Frontier Institute (Feb. 19, 2025), https://perma.cc/235U-V8LF (linking to op-ed originally run in Lee Newspapers).

12. The Institute advocates for ballot measures that further its mission and against those that oppose its mission at every stage necessary, before and after certification to voters. In 2022, it advocated against I-191, a proposed initiative to give "outstanding resource waters" designation to portions of the Gallatin and Madison Rivers, while supporters were seeking enough signatures for certification.[10] In 2025, the Institute joined several other organizations to detail concerns with the WARD initiative, which was on the ballot to change the water requirements for new residential housing.[11] Earlier this year, the Institute published an analysis of the effects of BI-11, an initiative proposed by Senator Wylie Galt to cap property tax growth, and outlined its position on the proposal in the Institute's weekly newsletter

[10] *See* Kendall Cotton, *River protection measure would erode our state's Constitution*, Daily Montanan (June 16, 2022), https://perma.cc/324Z-BACJ.

[11] *See* Shawn Regan, Kendall Cotton, and Conner Harwood, *WARD would hurt both housing and water conservation*, Bozeman Daily Chronicle (Oct. 20, 2025), https://perma.cc/S5YH-TF7P.

and in a blog post.[12] In September 2026, it published a statement of opposition to I-194.[13] And it has already published a position opposing a future ballot referendum, urging the legislature to let a statewide property tax levy expire by not referring it to voters during the 2027 session.[14]

13. The Institute's events and communications advocating for legislative and regulatory change sometimes include elected officials, or they discuss elected officials' efforts to support or oppose legislation or regulation on which the Institute has taken a position.[15] It publishes

---

[12] *What BI-11 Would Actually Mean For Your Property Taxes*, Frontier Institute (Apr. 2, 2026), https://perma.cc/SZ5X-PN2A.

[13] *Frontier Institute Issues Statement of Opposition to Initiative 194*, Frontier Institute (Sept. 16, 2026), https://perma.cc/M4MV-RXDF; Kendall Cotton, *I-194 Is Dangerously Overbroad*, Frontier Institute (Sept. 29, 2026), https://perma.cc/U7YV-SCBA (linking to original publication in Lee Newspapers).

[14] *Frontier Institute Calls for Expiration of the 6-Mill University Property Tax Levy*, Frontier Institute (July 22, 2026), https://perma.cc/WWF9-EGPH.

[15] *See, e.g.*, *The Frontier Briefing: Fighting Fraud, Expanding Choice with Commissioner James Brown*, Frontier Institute (July 27, 2026), https://perma.cc/RF2A-T4HT (interview with James Brown, Montana State Auditor and Commissioner of Securities and Insurance); *MTLeg*

those communications—including through social media, newsletters, op-eds, releases, and website statements when the issues are salient, for example—when public concern is high or when lawmakers and executive officials are taking action, which would include times near elections. While those elected officials are sometimes candidates in those elections, the Institute does not tell voters whether to support or oppose them as candidates.

14. The Institute has already begun publishing its positions and informing the public about legislation to be proposed in 2027.[16]

15. Frontier Institute expends money through the staff time and other resources used to prepare and then publish its communications, including through its website, social media, and electronic mailings. It has not spent more than $250 to support or oppose any ballot measure.

---

*Weekly Debrief: Halftime Report*, Frontier Institute (Mar. 7, 2023), https://perma.cc/L9JX-FJ27 (discussing bills that Frontier supports and noting sponsors); *2025 MTLeg Weekly Debrief: 2/24-2/28*, Frontier Institute (Feb. 26, 2025), https://perma.cc/WBN8-9QQP (same).

[16] *Frontier Institute Response to Yellowstone County's Request to Revise the Right to Compute Act*, Frontier Institute (Sept. 24, 2026), https://perma.cc/6ER3-KVLH.

16. Well before I-194 was even proposed, the Institute began discussing the formation of Frontier Action Fund, an affiliated § 501(c)(4) organization. The Institute's board considered the Action Fund at the Institute's annual strategy meetings on June 19, 2025, and June 4, 2026. The board approved preliminary legal work for creating the Action Fund on June 17, 2026, and it approved the creation, affiliation, and cost-sharing methodology for the Action Fund on October 15, 2026. The Action Fund's Articles of Incorporation were filed with the State of Montana on November 3, 2026.

17. Frontier Action Fund serves as Frontier Institute's primary 501(c)(4) advocacy partner, pursuing an aligned mission and aligned policy goals through lobbying, grassroots mobilization, and issue advocacy at the local, state, and federal levels. The Action Fund will similarly engage in advocacy for and against ballot measures, but it will increase those efforts consistent with its tax status.

18. In 2027 and 2028, the Action Fund intends to engage in issue advocacy related to the role of the judiciary, including highlighting the records of judges, some of whom may be candidates. This issue advocacy

will include advertisements, such as digital ads, mailers, and TV broadcast ads. While candidate advocacy will not be a major purpose of Frontier Action Fund, the organization intends to engage in some limited activity to support or oppose candidates, including endorsements. This would include publications endorsing candidates in competitive judicial races in 2028.

19. Frontier Action Fund will expend money through the staff time and other resources used to prepare and then publish its communications, including through its website, social media, and electronic mailings. It will also spend money on digital ads, mailers, and TV broadcast ads.

*Montana Family Institute and Montana Family Foundation*

20. Neither the Montana Family Institute nor the Montana Family Foundation is owned by any candidate, political party, or political committee. The organizations are dedicated to supporting, protecting, and strengthening Montana families. Hearkening to the principles underlying America's founding and the Declaration of Independence, the Foundation believes that government's responsibility is to protect

people's inalienable rights. This includes the duty to protect life, which the Foundation regards as sacred from conception to natural death. And because the family is a fundamental institution in a civil society, one whose breakdown creates a moral, social, and political crisis, the Foundation urges government to promote and protect the formation and well-being of families. The organizations provide a voice for the family by advocating for religious liberty, school choice, protection of life, marriage, and parental rights.

21. The Institute's and the Foundation's events and communications advocating for legislation that supports life and family sometimes discuss elected officials' actions supporting or opposing legislation relevant to their missions. For example, after each legislative session, the Foundation produces a legislative scorecard informing the public how legislators voted on bills related to the organization's core issues, including life, religious liberty, and school choice. The Foundation expends resources on staff time preparing the scorecard, putting it on the Foundation's website, and emailing it to supporters, as well as on paying for printing and shipping of paper

copies. The Foundation intends to publish its legislative scorecard after the 2027 and future sessions.

22. Other communications by the Institute and the Foundation, including the podcast and radio program, also refer to legislators supporting and opposing legislation and policies relevant to their missions. They intend to continue expending resources on communications that further laws that support life and families in 2027 and beyond.

*Montana GOP*

23. Montana GOP is the official Republican Party organization in Montana. It represents Republican voters in Montana, promotes Republican values, and assists Republican candidates in state and local races.

24. The party supports the election of Republican candidates through direct financial contributions to candidates and their organizations; technical and research assistance to candidates and party organizations; voter registration, education, and get-out-the-vote programs; and other party-building activities.

25. Montana GOP regularly makes independent expenditures for and against candidates. The independent expenditures include SMS messages, direct mailings, display ads, and ringless voicemails. It has already made multiple such expenditures in 2026, including communications supporting candidates in multiple state house and senate races.

26. The party maintains separate accounts for candidate contributions and for independent expenditures. It accepts contributions from corporations and other entities to the account it uses for independent expenditures, and it receives these contributions beginning each January and throughout the year. It uses those contributions to fund its independent expenditures.

27. In 2025, the MTGOP began producing an ongoing newsletter, which it emails to county central committee members and makes available to the public by publishing it on the party's website.[17] Newsletters are sent and published according to the volume and

---

[17] *See, e.g.*, *Newsletters*, MTGOP (last visited Oct. 30, 2026), https://perma.cc/6NKQ-HBHP.

urgency of the news. The party's goal is to publish the newsletter at least quarterly, but it sometimes releases an issue a month.[18]

28. The newsletters link to articles published on the party's website, in newspapers, and in other locations, and the newsletters include statements and images selected from the articles. The statements selected for the newsletter and the articles themselves sometimes include materials urging readers to support or oppose candidates.[19]

29. Paid staff are involved in preparing and sending the newsletter and in placing the newsletter on MTGOP's website.

---

[18] *See id.*

[19] *See, e.g.*, *Winter Kickoff – Special Newsletter*, MTGOP (Feb. 11, 2026), https://perma.cc/UKK7-MALB (quoting Judge Wilson expressing his "hope you'll consider supporting me"); Debbie Churchill, *Don't Let a Bright Red Future Turn Into a Dull Blue Disaster*, MTGOP (Feb. 11, 2026), https://perma.cc/97BQ-DJS9 (encouraging support for the Republican candidate in the Western Congressional District) (linked to in *February Newsletter*, MTGOP (Mar. 2, 2026), https://perma.cc/4XUM-3BAS).

30. The party is currently preparing the next issue of the newsletter for release during fall 2026, and it intends to continue publishing the newsletter with similar content in 2027 and beyond.

*I-194*

31. Montana's citizens passed I-194 on November 3, 2026.[20] Its speech prohibitions will take effect on January 1, 2027. I-194 § 14.

32. I-194 targets any "entity whose existence, legal status, or limited liability shield is conferred by the laws of the state of Montana." *Id.* § 3(1).

33. This would include the entities and organizations formed under Title 35, including benefit corporations, nonprofit corporations, religious corporations sole, professional corporations, business trusts, limited liability companies, limited partnerships, business corporations, cooperative associations, agricultural associations, and rural cooperative utilities, as well as organizations like banks, credit unions,

[20] *See General Election Results*, Montana Secretary of State, https://electionresults.mt.gov/resultsSW.aspx?type=BQ&map=CTY (last visited Nov. 3, 2026).

and even unincorporated associations. *See*, *e.g.*, MCA §§ 35-1-1405 & 35-1-1406(5) (formation and limited liability of benefit corporations); §§ 35-2-212–216 & 35-2-516 (incorporation and limited liability of nonprofit corporations); § 35-3-205 (incorporation of religious corporations sole); § 35-4-208 (incorporation requirements for professional corporations); § 35-5-103 (business trusts subject to corporation provisions, including limited liability); § 35-8-202 (articles of organization for limited liability companies); § 35-12-703 (no liability for limited partners in limited partnerships); §§ 35-14-202 & 35-14-622 (articles of incorporation and limited liability for business corporations); § 35-15-201 (incorporation and liability provisions for cooperative associations); §§ 35-16-101 & 35-16-202 (requirements for incorporation and applying general corporate laws for agricultural associations); §§ 35-18-106 & 35-18-203 (incorporation and perpetual existence of rural cooperative utilities); § 32-1-302 (incorporation of banks); and §§ 32-3-301 & 32-3-309 (organization and limited liability of credit unions); *see also* I-194 § 3(3) ("any legal benefit that exists only because the state of Montana confers it on an artificial person, including limited

liability, perpetual duration, succession in entity name, or any statutory limitation on personal liability"); *id.* § 5(3) ("apply to any trust, statutory trust, business trust, or similar arrangement to the extent Montana law confers limited liability, perpetual duration, succession in name, or any other charter privilege by reason of that form"); I-194 Ballot Statement ("unincorporated associations"); *Transparent Election Initiative v. Knudsen*, 591 P.3d 173, 180 (Mont. 2026) (to avoid misleading voters, including "unincorporated associations" among "artificial entities" in ballot language for related initiative).

*Definitions*

34. To prevent these "artificial persons" from engaging in any "political spending," I-194 § 2(4), the law creates several broad definitions.

35. The law defines "artificial-person powers" as those "necessary or convenient to carry out lawful business, charitable, cooperative, or organizational purposes as provided by Montana law, excluding political spending power." I-194 § 3(2).

36. It defines "political spending power" as "the legal capacity to pay, contribute, or expend money or anything of value to support or oppose . . . a candidate, political party, or political committee . . . or . . . any initiative, referendum, . . . or other question formally certified or submitted to" voters. *Id.* § 3(4).

37. The Initiative, however, allows media corporations to engage in election and ballot-issue activity by excluding their activity from the definitions. It states that political spending power does not include "the distribution of bona fide news, commentary, or editorial content." *Id.* § 3(4)(b).

38. It further excludes the activity of political committees, as defined by existing campaign finance law, from the definition of political spending power. *Id.* § 3(4)(c); *see also id.* § 2(6)(b) ("except as expressly provided by law for political committees"); *id.* § 4(1) ("Except as expressly provided by law for political committees . . . ."); *id.* § 5(5) ("not restrict the lawful activities of political committees organized under Montana law or federal law").

39. Except for political committees and media corporations engaging in bona fide news and commentary, artificial entities are prohibited from "expend[ing] money or anything of value to support or oppose the outcome of a vote of the electorate." *Id.* § 4(1).

*Changing organizational powers to prohibit protected First Amendment activities*

40. The new law gives a precarious existence to organizations that it calls artificial entities, stating that they "exist only by virtue of powers affirmatively extended by the state." *Id.* § 2(1). It then requires that these entities have license to speak and denies such license for unapproved subjects. And should entities speak about those unapproved subjects, it empowers the Attorney General and Secretary of State to pursue and/or impose a number of penalties.

41. I-194 requires that the Secretary of State "adopt rules and procedures necessary to implement and enforce" the law, *id.* § 8(1), and gives the Attorney General "responsibility to bring actions to enforce" it, *id.* § 8(2). Penalties include revoking an organization's charter privileges, including limited liability, perpetual duration, succession in entity name, and any statutory limitation on personal liability. *Id.*

§ 7(1)-(2). That is, the organization ceases to exist. *Cf.* I-194 Ballot Statement ("punished by forfeiting all privileges to do business in Montana"); *Transparent Election Initiative*, 591 P.3d at 179 (noting that consequence of such laws in "ordinary language" is revocation of legal status).

*Prohibition on protected First Amendment activities by foreign entities*

42. Although a foreign entity may not have regular, systematic, or continuous contacts with Montana, and even though a communication by the entity may be arranged through media of interstate commerce—like mail, telephone, and internet—or through independent contractors, I-194 states that when it "directly or indirectly undertakes, finances, or directs the exercise of political spending power in the state of Montana," a foreign entity "is conclusively considered to be transacting business in this state for the purposes of" the Initiative. I-194 § 3(1).

43. The Initiative thus makes its prohibition on political spending "apply to an artificial person organized or existing under the laws of another jurisdiction." *Id.* § 5(2).

44. I-194 does not clearly state what penalties may apply to foreign entities that engage in political spending. *Id.* § 7(3) (noting that I-194's provisions "do not purport to affect privileges conferred by the laws of another jurisdiction"). Under existing law, however, foreign business and nonprofit corporations must register or obtain a certificate of authority to transact business in the state. *See* MCA §§ 35-14-1502(1) & 35-2-820(1). The lack of a certificate prevents a foreign corporation from bringing or maintaining its own action in a Montana court, *id.* §§ 35-2-821(1)–(3) & 35-14-1502(2), and foreign nonprofit corporations are liable to a $5 per day penalty for each day, up to $1,000 in a year, for transacting business without a certificate, *id.* § 35-2-821(4). But failure "to obtain a certificate of authority does not impair the validity of its corporate acts or prevent it from defending any proceeding in" Montana. *Id.* § 35-2-821(5); *accord id.* § 35-14-1502(3).

*Press exemptions*

45. The Initiative exempts certain speakers—the institutional press—from these regulations. It exempts from the definition of political spending power "the distribution of bona fide news, commentary, or

editorial content unless the publishing entity is owned or controlled by a political party, a political committee, or a candidate." I-194 § 3(4)(b).

46. The Center for American Progress—which came up with the "legal strategy" underlying I-194,[21] and presents proposed language for statutes implementing the strategy[22]—states that these exemptions are for news corporations. "Limited exceptions must be made for media entities to allow for normal news reporting and opinion by news corporations . . . ."[23]

---

[21] *See* Tom Moore, *Undoing* Citizens United *and Reining In Super PACs*, Center for American Progress (Sep. 15, 2025), https://bit.ly/4ugUQ4N; *see also Gabriel Furshong*, *Montanans push back against corporate money*, The Ashland Chronicle (Sept. 18, 2026), https://perma.cc/7Y38-P4PX (noting that Jeff Mangan founded the organization pushing the initiative after Tom Moore of the Center for American Progress sent him the strategy).

[22] *See* Tom Moore, *The Corporate Power Reset That Makes* Citizens United *Irrelevant*, Center for American Progress (Sep. 15, 2025), https://bit.ly/3RJtV2S.

[23] *Id.*

*The Regulatory Regime's Impact on Frontier Institute and Frontier Action Fund*

47. Frontier Institute's and Frontier Action Fund's missions require that they advocate for and against ballot measures—similar to the Institute's past activity—in 2027 and beyond. They will do so before and after certification of ballot measures. For example, the legislature has referred the 6-Mill levy to voters every 10 years since 1948. Frontier Institute and Frontier Action Fund will advocate against it at every stage, against referral by the legislature and against voter approval. Similarly, in 2026 Frontier Institute began a campaign calling for taxpayer protections, including constitutional protections.[24] The Action Fund will seek support to bring such a taxpayer protection amendment forward, and with that support it intends to form a ballot committee to get the amendment on the ballot and to get voters to pass it. Both organizations will actively monitor for additional ballot measure

[24] *Taxpayer Protection Now*, Frontier Institute, https://perma.cc/5HQH-FEDX (last visited Oct. 29, 2026); *Frontier Institute Launches Taxpayer Protection Now Campaign*, Frontier Institute (June 29, 2026), https://perma.cc/4J2L-L924.

proposals that relate to economic freedom, consistent with their missions, such as past proposals for the Bozeman WARD measure and the Gallatin water measure, and then engage as appropriate. Consistent with its mission, Frontier Action Fund also intends to engage in limited advocacy for and against candidates.

48. Neither organization will itself spend more than $250 on election communications, electioneering communications, or independent expenditures supporting or opposing any ballot measure or candidate. Frontier Action Fund may contribute to a separate ballot-issue committee or political committee, and it would register as an incidental committee if it makes any contribution over $250.

49. By engaging in such communications, however, both organizations risk penalties under I-194, including the possibility of involuntary dissolution. As a result, Frontier Institute and Frontier Action Fund will refrain from engaging in communications related to ballot measures after January 1, 2027, and Frontier Action Fund will avoid any candidate advocacy, and they must also refrain now from any

preparatory research, writing, and activity for those communications, as any such effort will have no use.

50. The organizations' missions also require that they engage in legislative and other policy advocacy in 2027 and beyond, but much of this advocacy requires that they discuss the actions and positions of officeholders who may also be candidates. Defendants may interpret communications that thus mention candidates as election activity under I-194's broad definitions of political spending power. Frontier Institute and Frontier Action Fund will then face penalties under I-194, including involuntary dissolution. At the very least, the organizations would face the burden of responding to and defending against complaints filed against them with Defendants.

51. As a result, after January 1, 2027, Frontier Institute and Frontier Action Fund must refrain from legislative and other advocacy mentioning candidates, and they must also refrain now from any preparatory research, writing, and activity for those communications, as any such effort will have no use.

52. Moreover, I-194's vague terms make it so that Frontier Institute and Frontier Action Fund cannot know when or how Defendants will interpret the organizations' legislative and other policy advocacy as prohibited political activity, and thus also when donations from other groups and entities to the organizations might be treated as prohibited donations for political activity. To avoid wandering into the shoals of vagueness, Frontier Institute and Frontier Action Fund must further censor their legislative, regulatory, and issue advocacy.

53. The purpose of Frontier Action Fund is to extend Frontier Institute's ability to fulfill its mission in Montana. In prohibiting Frontier Action Fund from engaging in ballot, candidate, and legislative activity, I-194 thus harms Frontier Institute by inhibiting its core goals.

54. Donors give to organizations like Frontier Institute and Frontier Action Fund to support their missions and core programs. Donors' support is premised on the organizations' effectiveness in advancing their missions. In restricting their ability to advance their missions, and thus encouraging donors to give less or not at all, I-194 harms Frontier Institute and Frontier Action Fund.

*The Regulatory Regime's Impact on Montana Family Institute and Montana Family Foundation*

55. The Foundation intends to continue supporting measures that further its mission and to oppose measures that go against it. By engaging in communications that support or oppose ballot measures, however, the Foundation will face penalties under I-194, including involuntary dissolution. As a result, the Foundation must refrain from engaging in communications related to ballot measures after January 1, 2027, and it must refrain now from any preparatory research, writing, and activity needed to produce such advocacy, as any such effort will serve no purpose.

56. The organizations' missions require that they communicate about legislation and other public issues, but much of this education and advocacy requires that they refer to the actions and positions of officeholders who may also be candidates. Defendants may interpret the communications that mention candidates as supporting or opposing candidates under I-194's broad definitions of political spending power. The organizations would then face the burdens of responding to and

defending against complaints and legal actions, as well as penalties that could include involuntary dissolution.

57. The Institute and the Foundation must therefore refrain from legislative and other advocacy mentioning candidates after January 1, 2027, and they must refrain now from any preparatory research, writing, and activity needed to produce such advocacy, as any such effort will serve no purpose.

58. The Institute and the Foundation must further censor their issue advocacy because I-194's vague terms make it so that they cannot know when Defendants will interpret such advocacy—even when it does not mention a candidate—as prohibited political spending.

59. Furthermore, if Defendants treat such issue advocacy as prohibited activity, they could pursue penalties against the organizations' donors for supporting that issue advocacy, harming the organizations' ability to get the contributions necessary to fulfill their missions. I-194 will also harm the organizations' ability to get needed contributions because the Act hinders the organizations in carrying out the missions that the donors support.

*The Regulatory Regime's Impact on Montana GOP*

60. As it has done in past years, Montana GOP plans to continue making independent expenditures to support Republican candidates in state and local Montana races, and to support candidates aligned with the party's mission in nonpartisan races. To do so, however, it relies on contributions to its independent-expenditure account by corporations and other entities.

61. Beginning on January 1, 2027, however, I-194 will prohibit corporations and other entities from making these contributions. This will significantly reduce the funds the Montana GOP needs to make independent expenditures, and thus harm its ability to fulfill its mission.

62. Although I-194 exempts certain news, commentary, and editorial content from its prohibition on political spending, and it states that political committees may exercise political spending power, the Act still forbids news, commentary, and editorial content made by a political party or a political committee. Accordingly, after January 1, 2027, Montana GOP must either refrain from publishing its newsletter, or the

party must censor any content that might be construed as supporting or opposing a candidate. That is, it must refrain from carrying out MTGOP's mission of assisting Republican candidates in their races.

## COUNT ONE
## RIGHT OF FREE SPEECH, U.S. CONST. AMENDS. I, XIV
## 42 U.S.C. § 1983

63. Plaintiffs reallege and incorporate by reference paragraphs 1 through 62.

64. The First Amendment, which applies against Montana by operation of the Fourteenth Amendment, guarantees the right to free speech.

65. The Supreme Court has long held that "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964). And the First Amendment's protections have their "fullest and most urgent application to speech uttered during a campaign for political office." *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989) (quotation marks omitted). "[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free

discussion of governmental affairs . . . ." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (per curiam) (quoting *Mills v. Ala.*, 384 U.S. 214, 218 (1966)) (quotation marks omitted). This would "of course includ[e] discussions of candidates," *id*. (quotation marks omitted), but also public issues and ballot measures.

66. A law like I-194 is a ban on an organization's speech even if it allows "a PAC created by [the organization to] speak." *Citizens United*, 558 U.S. at 337. But I-194's ban on "expend[ing] money or anything of value to support or oppose" a candidate or ballot measure, I-194 § 3(4), prevents corporations and other organizations from using even the resources necessary to establish or maintain a political committee.

67. The Supreme Court has long "recognized that First Amendment protection extends to corporations." *Citizens United*, 558 U.S. at 342. And under later cases extending those precedents, "political speech does not lose First Amendment protection simply because its source is a corporation." *Id*. (quotation marks omitted). The same logic protecting these rights extends to other organizations registered with or

otherwise recognized by the state, such as partnerships, companies, and associations.

68. The First Amendment protects organizations' speech as much for the organizations' rights as for their contribution to the marketplace of ideas and the right of the people to hear those contributions and decide what they want to hear. "Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster.'" *Id.* at 343 (quoting *Bellotti*, 435 U.S. at 783).

69. A ban like I-194 thus "necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 339 (quotation marks omitted). And it therefore violates "[t]he right of citizens to inquire, to hear, to speak, and to use information to reach consensus," which "is a precondition to enlightened self-government and a necessary means to protect it." *Id.* (quotation marks omitted).

70. The approval committee for the initiative argues that the law is necessary to eliminate what it calls "dark money"—money whose

sources are not made public—because such money is used for communications that are neither "completely accurate nor helpful," to "negatively attack" one candidate and "inflate[]" another, and to make sure that "every dollar" spent in Montana campaigns be from a "human person" whose donation is disclosed.[25] And the ballot committee for the initiative argues that it is needed to keep the "voices of ordinary voters [from] get[ting] drowned out" by "corporations, dark-money groups, and other artificial entities," to thus "**create more meaningful political speech by real people, not less**."[26] Those are not substantial or compelling governmental interests.

71. Furthermore, I-194 restrains a single class of speech, "expression at the core of our electoral process and of the First Amendment freedoms." *Buckley*, 424 U.S. at 39 (quotation marks

[25] Approval Committee, *Arguments for I-194*, Montana Voter Information Pamphlet 24-25 (2026) (last visited Oct. 14, 2026), https://bit.ly/4jGrQRB.

[26] "I-194 protects real people's free speech," *The Facts*, The Montana Plan (last visited Oct. 14, 2026), https://perma.cc/89HW-UEQJ (bold in original).

omitted). That is, it applies only "because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). The Initiative's prohibition is therefore a content-based restriction on speech, and it fails strict scrutiny.

72. The First Amendment "[p]rohibit[s] . . . restrictions distinguishing among different speakers, allowing speech by some but not others," if for no other reason than that "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 340.

73. Such discrimination robs the public of information "indispensable to decisionmaking in a democracy," *id.* at 349 (quotation marks omitted), and denies the dignity of a democratic people, usurping citizens' right to get information from the sources they choose and of their "freedom to think for [them]selves," *id.* at 356. And it deprives the disfavored speaker of "the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Id.* at 340-41.

74. "In the realm of protected speech," therefore, "the legislature"—or the people directly exercising the legislative power—"is

constitutionally disqualified from dictating . . . the speakers who may address [any] public issue," *id.* at 347 (cleaned up), much less core protected speech.

75. I-194 nonetheless discriminates between speakers, prohibiting political speech made by organizations that have taken the corporate form, but allowing the same speech by speakers who have not. And it discriminates in allowing speech by some organizations that have taken some corporate form and prohibiting it by others. In doing so, it demonstrates that the law is unconstitutionally underinclusive.

76. On its face, and as applied against Plaintiffs, their donors, and their audiences, I-194's content-based prohibition on political speech by disfavored entities that have taken the form of "artificial persons" violates the First Amendment right of speech.

77. And it is no excuse that the state may be granting a benefit through corporate or other status. The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests -- especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "[D]eny[ing] a benefit . . .

because of . . . constitutionally protected speech or associations" is to "penalize[] and inhibit[]" a person for the "exercise of those freedoms." *Id.* The government may not thus "'produce a result which [it] could not command directly.'" *Id.*

78. But by threatening corporations and other organizations with dissolution and other penalties if they engage in constitutionally protected political speech, and by conditioning foreign corporations' access to Montana on their surrender of First Amendment rights, the state has done precisely that. "Such interference with constitutional rights is impermissible." *Id.*; *see also Rust v. Sullivan*, 500 U.S. 173, 197 (1991) (cannot bar benefit recipient from all protected activity).

79. By enforcing these provisions, Defendants—under color of law—deprive Plaintiffs, their donors, and their audiences of the right of free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus injured in violation of 42 U.S.C. § 1983, and they are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of I-194's unconstitutional customs,

policies, and practices; and to attorney fees and expenses under 42 U.S.C. § 1988.

### COUNT TWO
### FREEDOMS OF ASSOCIATION, ASSEMBLY, AND PETITION
### U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

80. Plaintiffs reallege and incorporate by reference paragraphs 1 through 62.

81. The First Amendment, which applies against Montana by operation of the Fourteenth Amendment, guarantees the rights of assembly and association, and the right to petition the government for a redress of grievances.

82. Corporations exist "to provide protection for human beings. . . . When rights, whether constitutional or statutory, are extended to corporations, the purpose is to protect the rights of these people." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 706-07 (2014).

83. Each of the "rights to speak, worship, publish, assemble, and petition . . . necessarily carries with it 'a corresponding right to associate with others.'" *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 184 (2026) (quoting *Ams. for Prosperity*

*Found. v. Bonta*, 594 U.S. 595, 606 (2021)). "With the freedom to associate, minorities can 'show their numerical strength,' influence policy, and 'stimulate competition' in the marketplace of ideas." *Id.* (quoting 1 A. de Tocqueville, *Democracy in America* 196-97 (H. Reeve transl., rev. ed. 1900)). This may be particularly relevant when distance separates individuals in rural areas, already making it hard to make themselves heard over urban populations. On the other hand, attempts to restrain that freedom of association make minority expression "particularly vulnerable to marginalization or outright suppression by the majority, leaving all of society poorer for it." *Id.* at 184-85 (quotation marks omitted).

84. Restraining association also violates individuals' exercise of other First Amendment freedoms. "Without such a right, no two men could safely share the same soapbox, no two women the same church. The government could reduce any assembly to a party of one, and the right to petition would amount to nothing more than the power to sign one's own name alone." *Id.* at 184.

85. Thus, "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association[.]" *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces" the First Amendment rights. *Id.*

86. Montana's stratagem of changing corporate powers is an attempted "nullification of [individuals'] right" of association before they can even arrive at the "moment of its assertion." *Id.* at 459. Plaintiffs may "assert these rights, because [each] . . . is but the medium through which its individual members seek to make more effective the expression of their own views," as well as their rights of petition and assembly. *Id.*

87. I-194's restrictions on associational freedoms are unsupported by any valid, let alone substantial or compelling, state interest. These restrictions are also content-based, as they apply on the basis of the topics, ideas, or messages advanced by people's associations, and on the

basis of the associations' identity. And I-194 impermissibly conditions legal protections and benefits granted to people's associations on a forfeiture of core fundamental First Amendment rights.

88. On its face, and as applied against Plaintiffs, their donors, and their audiences, I-194 violates individuals' rights of association, assembly, and petition to influence policy.

89. By enforcing these provisions, Defendants—under color of law—deprive Plaintiffs, their donors, and their audiences of the rights of assembly, petition, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus injured in violation of 42 U.S.C. § 1983, and they are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of I-194's unconstitutional customs, policies, and practices; and to attorney fees and expenses under 42 U.S.C. § 1988.

## COUNT THREE
## FREEDOM OF THE PRESS
## U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

90. Plaintiffs reallege and incorporate by reference paragraphs 1 through 62.

91. The First Amendment, which applies against Montana by operation of the Fourteenth Amendment, guarantees the freedom of the press.

92. "The liberty of the press is not confined to newspapers and periodicals," but "in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938). Addressing the most pressing issues of the day, through others' papers and their own papers and pamphlets, "[b]oth corporations and voluntary associations" have since the infancy our country "actively petitioned the Government and expressed their views." *Citizens United*, 558 U.S. at 389 (Scalia, J., concurring).

93. Press entities regularly produce endorsements expressly advocating for or against candidates and ballot measures. The Bozeman

Daily Chronicle, for example, has urged voters to approve multiple education levies.[27] In another editorial it noted a tradition of mixed-ticket endorsements going back over 30 years.[28] And that paper is not alone in endorsing positions on ballot measures[29] and in candidate races.[30]

94. Likewise, press entities regularly cover the events and actions of various candidates for office, even close to the election, and name

---

[27] *Our View: Vote 'yes' on school levies to keep streak of support intact*, Bozeman Daily Chronicle (Apr. 28, 2025), https://perma.cc/PA8C-HUC8; *Editorial: Voters should approve Bozeman school levies*, Bozeman Daily Chronicle (Apr. 22, 2024), https://perma.cc/E32K-LRK2.

[28] Chronicle editorial board, *In state down-ballot races, Democrats deserve vote*, Bozeman Daily Chronicle (Oct. 8, 2020), https://perma.cc/N6TV-CMRB.

[29] *Editorial: Columbia Falls bond proposal deserves voter support*, Daily Inter Lake (Sept. 20, 2026), https://perma.cc/5X7G-YHYJ; *Montanans' privacy is on the ballot*, Daily Inter Lake (Oct. 16, 2022), https://perma.cc/M6PJ-GE3M.

[30] Staff, *Yellowstone County News Endorses Tim Sheehy for U.S. Senate*, Yellowstone County News (Sep. 27, 2024), https://perma.cc/LE79-T6A8; *ICYMI: "An Easy Call": Three More Montana Editorial Boards Endorse Democrat Mike Cooney Over Republican Greg Gianforte*, Democratic Governors Association (Oct. 19, 2020), https://perma.cc/87NG-8B6N.

those candidates and officeholders. This includes newspaper articles about events and actions in Montana.[31]

95. I-194 exempts "the distribution of bona fide news, commentary, or editorial content unless the publishing entity is owned or controlled by a political party, a political committee, or a candidate." I-194 § 3(4)(b). The Initiative does not define "bona fide," but the "plain meaning" of the term encompasses "use that is genuine, sincere and carried out in good faith." *Soc. Techs. Ltd. Liab. Co. v. Apple Inc.*, 4 F.4th 811, 817 n.8 (9th Cir. 2021). In the context of a law banning

[31] *See, e.g.,* Helena Dore, *Paradise Valley ridge named in honor of fallen Air Force pilots*, Bozeman Daily Chronicle (Oct. 13, 2020), https://perma.cc/TUX6-RD39 (discussing bill passed in part by efforts of Rep. Greg Gianforte); *Daines, Montana Republicans Celebrate Barrett's Confirmation to Supreme Court*, Missoula Current (Oct. 26, 2020), https://bit.ly/4BhbVPG (discussing reactions of Sen. Steve Daines and Rep. Greg Gianforte, and noting Gianforte's gubernatorial candidacy); Blair Miller, *Feds finalize rule for critical mineral extraction tax credit, benefitting Sibanye-Stillwater*, Daily Montanan (Oct. 30, 2024), https://perma.cc/F77Z-S5WV (noting Sen. Jon Tester's "perseverance" in getting rule passed); Arren Kimbel-Sannit, *Legislature v. judiciary: Senate Select Committee on Judicial Oversight and Reform takes a lesson in the separation of powers*, Montana Free Press (May 3, 2024), https://perma.cc/Z6LT-KRP2 (discussing actions of legislators, including Sen. Jason Ellsworth, Sen. Steve Fitzpatrick, Sen. Chris Friedel).

corporate support or opposition for candidates and ballot measures, genuine news would be communications that educate about current events but that do not urge readers to support or oppose candidates or ballot measures. A corporation's commentary would be made in good faith if there were no intent to create "political advantage" for a particular candidate or side of a ballot measure debate. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 26 F.3d 185, 191 (D.C. Cir. 1994) (Conference Report discussion regarding bona fide news interview exemption to equal time provisions).

96. Such a definition "would produce the dangerous, and unacceptable, consequence" that I-194 prohibits even media corporations from warning the public about problems with candidates' stances or background, or negative consequences of ballot measures. *Citizens United*, 558 U.S. at 351.

97. And if Defendants attempted to limit the exception to the institutional press—to media corporations—that would also violate the First Amendment, as the Supreme Court has "consistently rejected the proposition that the institutional press has any constitutional privilege

beyond that of other speakers." *Id.* at 352 (quotation marks omitted). Like any other user of the press, non-media corporations are "vehicle[s] of information and opinion," *Lovell*, 303 U.S. at 452, apprising the public of government officials' action and inaction about the most important issues of the day—even when those issues concern candidates or ballot measures. And corporations and other entities have likewise "actively petitioned the Government and expressed their views" about pressing issues. *Citizens United*, 558 U.S. at 389 (Scalia, J., concurring).

98. Furthermore, in limiting the news exception to "bona fide" communications, to those made in good faith, the Initiative introduces an unconstitutional intent-and-effect test. *See FEC v. Wis. Right to Life*, 551 U.S. 449, 467-69, 472 (2007) (Roberts, C.J., controlling op.). A test that depends on the speaker's intent, a test that forces a speaker to prove "that its motives were pure . . . 'blankets with uncertainty whatever may be said,' and 'offers no security for free discussion.'" *Id.* at 468 (quoting *Buckley*, 424 U.S. at 43).

99. Despite the important functions served by the press—in both its institutional and non-institutional forms—the state has with I-194 asserted the power to deny all corporations the right to use the press. And it has then pretended to return to certain corporations the right to use the press for certain purposes, but only by the grace of government. "But the First Amendment . . . does not leave us at the mercy of *noblesse oblige*." *United States v. Stevens*, 559 U.S. 460, 480 (2010) (prosecutorial discretion in enforcing speech restraints). The rationale underlying I-194 "would produce the dangerous, and unacceptable, consequence that [the legislature] could ban political speech of media corporations," *Citizens United*, 558 U.S. at 351 (citations omitted), as well as others using the press. The First Amendment leaves neither corporations wishing to use the press to communicate about important issues, nor the public choosing to learn from them, at the government's mercy.

100. I-194's restrictions on press freedoms are unsupported by any valid—let alone substantial or compelling—state interest. These restrictions are also content-based, as they apply on the basis of the

topics, ideas, or messages advanced by people's associations, and on the basis of the associations' identity. And I-194 impermissibly conditions legal protections and benefits granted to people's associations on a forfeiture of core fundamental First Amendment rights.

101. On its face, and as applied against Plaintiffs, their donors, and their audiences, I-194 violates the First Amendment in denying most "artificial persons" the right to use the press to discuss the most important matters of the day.

102. By enforcing these provisions, Defendants—under color of law—deprive Plaintiffs, their donors, and their audiences of the freedom of the press in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus injured in violation of 42 U.S.C. § 1983, and they are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of I-194's unconstitutional customs, policies, and practices; and to attorney fees and expenses under 42 U.S.C. § 1988.

## COUNT FOUR
## OVERBREADTH, U.S. CONST. AMENDS. I, XIV
## 42 U.S.C. § 1983

103. Plaintiffs reallege and incorporate by reference paragraphs 1 through 62.

104. "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Stevens*, 559 U.S. at 473 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

105. I-194 is unconstitutionally overbroad on its face because it restricts a substantial amount of protected speech relative to any legitimate sweep. For example, even if corporations are artificial entities whose powers the state controls, the state has no authority to prohibit individuals from pooling their money by treating them as an unincorporated association. And as another example, even if Montana could deprive domestic entities of their ability to discuss political affairs, it has no authority to limit the powers other states grant to their corporate entities.

106. By enforcing these provisions, Defendants—under color of law—deprive Plaintiffs, their donors, and their audiences of the rights of speech, assembly, petition, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus injured in violation of 42 U.S.C. § 1983, and they are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of I-194's unconstitutional customs, policies, and practices; and to attorney fees and expenses under 42 U.S.C. § 1988.

## COUNT FIVE
## VOID FOR VAGUENESS
## U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983

107. Plaintiffs reallege and incorporate by reference paragraphs 1 through 62.

108. The First and Fourteenth Amendments prohibit the enforcement of vague laws.

109. As discussed in ¶¶ 95-98, I-194's regulatory scheme provides no way of knowing the difference between "bona fide news" and prohibited activity.

110. The Initiative's definitions of "artificial person," "artificial-person powers," and "political spending power," as well as the prohibition on out-of-state entities "directly or indirectly . . . direct[ing] the exercise of political spending power," likewise violate the prohibitions against unconstitutional ambiguity in that they do not clearly warn speakers about what activity will trigger I-194's penalties. I-194 § 3(1) – (4). Potential speakers cannot determine whether the term "artificial person" applies only to groups that must register with the state, if it might include any group of two or more persons associating for some goal, or if it could even include money a grantor takes from a family living trust to buy a yard sign. When I-194 revokes the previous grant of "the same powers as an individual to do all things necessary or convenient to carry out its affairs," MCA § 35-2-118, and replaces it only with those "powers necessary or convenient to carry out lawful business, charitable, cooperative, or organizational purposes as provided by Montana law," I-194 § 3(2), an entity is left with no idea what those necessary and convenient powers might be. *See Transparent Election Initiative v. Knudsen*, 588 P.3d 129, 137 (Mont. 2026)

(Swanson, C.J., dissenting) ("It would take many pages to exhaustively list all the constitutionally-protected rights of entities which would be purportedly revoked and only restored subject to the whim of the Legislature . . . ."). And when "political spending power" is defined to prohibit giving or expending "money or anything of value to support or oppose" a candidate or ballot measure, I-194 § 3(4), a speaker cannot know if it is safe to speak about an issue that is even indirectly related to a candidate or ballot campaign.

111. The Attorney General and the Secretary of State—on their own or prompted by political and ideological opponents filing complaints to harass their adversaries into silence—may thus prohibit almost any "discussion of governmental affairs." *Buckley*, 424 U.S. at 14. And even if speakers ultimately triumph in defending their rights after investigation and enforcement, it will be only after fighting in administrative proceedings and the courts a battle whose conclusion they did not know. But the First Amendment prohibits laws that thus "trap the innocent by not providing fair warning," or that "foster arbitrary and discriminatory application," thus "inhibit[ing] protected

expression by inducing citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Id.* at 41 n.48 (internal quotation marks omitted) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)). I-194 is therefore void for vagueness.

112. By enforcing these provisions, Defendants—under color of law—deprive Plaintiffs, their donors, and their audiences of the rights of speech, press, assembly, petition, and association in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus injured in violation of 42 U.S.C. § 1983, and they are therefore entitled to declaratory and preliminary and permanent injunctive relief against continued enforcement and maintenance of I-194's unconstitutional customs, policies, and practices; and to attorney fees and expenses under 42 U.S.C. § 1988.

## Prayer for Relief

WHEREFORE, Plaintiffs request that judgment be entered in their favor as follows:

1. Orders preliminarily and permanently enjoining Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing the provisions of I-194, including any related sanctions or fines, or in the alternative, from enforcing against Frontier Institute, Frontier Action Fund, Montana Family Institute, Montana Family Foundation, Montana GOP, and their donors the provisions of I-194, including any related sanctions or fines;
2. Declaratory relief consistent with the injunction, to the effect that I-194 is unconstitutionally void and unenforceable, as it violates the First Amendment rights of speech, association, petition, assembly, and the press, facially and as applied to Frontier Institute, Frontier Action Fund, Montana Family Institute, Montana Family Foundation, Montana GOP, and their donors; and that I-194 is unconstitutionally overbroad;
3. Costs of suit, including attorney fees and costs under 42 U.S.C. § 1988; and

4. Any other relief as the Court deems just and appropriate.

Respectfully submitted,

*/s/ Albert Jones*
Albert Jones (Bar No. 14144)
VALLEY LAW, PLLC
517 S. 22nd Ave.,
Ste. 5
Bozeman, MT 59718
406-319-3024
albert@valleylawmt.com

*Counsel for Plaintiffs*

Owen Yeates (pro hac vice to be filed)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Ave., NW,
Ste. 801
Washington, DC 20036
202-985-1644
oyeates@ifs.org

Dated: November 3, 2026